**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GOLUB CAPITAL LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>NB ALTERNATIVES ADVISERS LLC and NEUBERGER BERMAN GROUP LLC d/b/a DYAL CAPITAL PARTNERS,<br><br>*Defendants*. | Civil Case No. ____________ |

Plaintiff Golub Capital LLC ("Golub"), by and through its undersigned counsel, alleges as follows against Defendants NB Alternatives Advisers LLC ("NBAA") and Neuberger Berman Group, LLC d/b/a Dyal Capital Partners ("NB/Dyal Capital" or "Neuberger"):

## NATURE OF THE ACTION

1. This action is brought in order to protect the large trove of Golub's proprietary, confidential, and deeply sensitive information and trade secrets that is currently in NBAA's possession, which NBAA is poised to sell to one of Golub's fiercest competitors. NBAA[1] obtained this information from Golub while exploring a potential investment in Golub. As articulated in the stringent non-disclosure agreement (the "NDA") signed by NBAA in advance of receiving any of Golub's information, Golub provided this information for the sole and exclusive purpose of allowing NBAA to determine if it wanted to make an investment in Golub and on what terms. After evaluating the information received under the NDA, NBAA ultimately decided to invest,

[1] As discussed further below, to the extent that the Court were to find that the NDA was executed by Neuberger d/b/a Dyal Capital Partners, then allegations in this Complaint referencing NBAA would apply equally to Neuberger d/b/a Dyal Capital Partners ("NB/Dyal Capital"), as the party who received and controlled the confidential information provided by Golub under the NDA.

and on August 3, 2018, three Dyal investment vehicles (Dyal Capital Partners Mirror Aggregator (A) LP, Dyal Capital Partners Mirror Aggregator (B-GIM) LP, and Dyal Capital Partners Mirror Aggregator (B-GGP) LP, collectively, the "Dyal Funds")—none of which existed or had been disclosed to Golub at the time of the signing of the NDA—made an investment in Golub pursuant to an investment agreement (the "Investment Agreement"). That should have ended NBAA's need for, and use of, the information provided under the NDA. Instead, NBAA retained the information, likely relied upon it in ongoing monitoring and evaluation of its investment, and has now refused to return Golub's information, and instead plans to transfer it directly into the hands of one of Golub's fiercest competitors in connection with its impending merger. This transfer is prohibited by the NDA and will be a violation of federal and state trade secrets law.

2. The information Golub disclosed to NBAA under the NDA is extremely valuable, encompassing core information and trade secrets regarding Golub's fundraising and lending strategy, long-term goals, assets, and business practices. Golub expends significant effort and resources to keep this information confidential, as disclosure of even a small portion of this information would be harmful to Golub's business.

3. Accordingly, the NDA provides strict protections for that information. The NDA requires NBAA to "keep all Information strictly confidential" and "use the information ***solely*** in connection with its evaluation, negotiation and implementation of a Transaction." The NDA goes even further to impose upon NBAA the affirmative obligation to "take all measures … to protect the secrecy of, and to avoid disclosure or use of, the Information in order to prevent it from falling into the public domain or the possession of persons other than [NBAA's] Representatives authorized by this Agreement to have the Information." The NDA expressly bars NBAA from

sharing any confidential information with any "Affiliate or department or business line that invests in, or provides services to, alternative asset fund sponsors."

4. Yet, NBAA and NB/Dyal Capital are poised to transfer all of this confidential and trade secret information to a direct competitor of Golub, Owl Rock Capital Partners, as part of Neuberger's sale of its Dyal Capital Partners division into a merged entity that will be known as Blue Owl. In other words, NBAA plans to funnel Golub's carefully guarded proprietary information directly into the file cabinets of one of Golub's major competitors. Neuberger, for its part, stands to earn approximately five billion dollars from this transaction.

5. This disclosure of Golub's critical confidential information is not only expressly prohibited by the NDA, but now also threatens an egregious misappropriation of Golub's most closely-guarded trade secrets, in the face of a clear and known duty under the NDA to maintain the secrecy of this information. These disclosures thus threaten violation of state and federal trade secrets law.

6. As a safety valve, Golub negotiated for and included a provision in the NDA that would allow Golub "at any time and for any reason" to request the return and destruction of all the information that Golub provided to NBAA under the NDA, including "all notes, models, analyses, studies, interpretations, memoranda and other documents, material or reports (in any form or medium) prepared by [NBAA] that contain, reflect or are based upon, in whole or part, the information." When Golub made a timely request for this return and destruction in advance of the Blue Owl transaction, however, NBAA allowed its contractually permitted response time to lapse, and then refused to confirm that it has taken the necessary steps to identify where the confidential information resides (in all its forms), collect it from its Representatives (as such term is defined in the NDA), and destroy it. In fact, it never returned or destroyed any of Golub's information. Thus,

on information and belief, Golub's highly confidential information remains scattered across the NB/Dyal Capital business, from where it will be transferred in the Blue Owl transaction in a matter of weeks.

7. Golub therefore seeks injunctive relief, specific performance, and damages to stop these obvious and egregious violations of the NDA and the threatened misappropriation of its trade secrets.

## THE PARTIES

8. Plaintiff Golub Capital LLC (defined above as "Golub") is a Delaware limited liability company with its principal place of business in New York, New York.

9. Defendant NB Alternatives Advisers LLC (defined above as "NBAA") is a Delaware limited liability company. On information and belief, NBAA has its principal place of business in Dallas, Texas.

10. Defendant Neuberger Berman Group LLC d/b/a Dyal Capital Partners (defined above as "NB/Dyal Capital" or "Neuberger") is a Delaware limited liability company. On information and belief, NB/Dyal Capital has its principal place of business in New York, New York. Dyal Capital Partners is not a distinct legal entity. Instead, Dyal Capital Partners is an internal division of Neuberger through which Neuberger does business. Dyal principals and employees use Neuberger email addresses and are employed by Neuberger. Dyal and Neuberger have the same New York address, and the Dyal Capital Partners website displays the Neuberger Berman logo and describes Dyal Capital Partners as "Part of Neuberger Berman Group LLC".

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, namely the Defend

Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. To the extent this action implicates state-law doctrines, the Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) as the state-law claims are part of the same case or controversy.

12. The forum selection clause at § 10 of the NDA, requires that disputes arising under the NDA be litigated in federal court so long as federal jurisdiction is proper. It reads, in relevant part:

> Each party hereby irrevocably and unconditionally consents to the exclusive jurisdiction of the Federal courts in New York County, New York and, only if such matter will not be heard by such Federal courts, the state courts in New York County, New York for any action, suit or proceeding arising out of or related hereto.

NDA § 10. Under this provision, the Court also has personal jurisdiction over NBAA and NB/Dyal Capital.

13. The Court has general personal jurisdiction over NB/Dyal Capital for the additional reason that NB/Dyal Capital's principal place of business are is New York, rendering NB/Dyal Capital "at home" in New York for the purposes of general personal jurisdiction.

14. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the Defendants' principal places of business are within this District and because a substantial part of the events giving rise to the claim occurred within this District.

15. Venue is additionally proper because the parties consented to this venue in an applicable forum selection clause, which reads, in relevant part:

> Each party hereto further hereby irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or relating to this Agreement in a Federal or state court in New York County, New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in any inconvenient forum.

NDA § 10.

## FACTUAL ALLEGATIONS

16. Golub is an alternative asset manager, providing private-credit services, with offices in New York, Chicago, San Francisco, and London. Golub has over $35 billion of capital under management, which Golub uses to provide direct lending and debt financing services to middle-market companies.

17. Golub raises capital from its limited partners and deploys that capital to provide direct lending and debt-financing services to a portfolio of companies. Golub also operates a publicly traded business development company ("BDC") to provide direct lending and debt-financing services.

18. Neuberger Berman Group LLC is a large asset-management firm with over $400 billion in assets under management. Neuberger has several internal business divisions, which focus on investments in different asset classes. One such internal business division of Neuberger is called Dyal Capital Partners, which raises capital from limited-partner investors and then uses that capital to acquire minority ownership stakes in other asset management firms, including both private equity firms and private lenders, like Golub. This investment model is referred to as the "GP Stakes" business. Importantly, no corporate formalities were taken to create a separate legal entity called Dyal Capital Partners, and Dyal Capital Partners is not a distinct legal entity. Additionally, all employees who work in Neuberger's GP Stakes business are employed by Neuberger or its related affiliates, and not any entity that contains the name "Dyal." In the "GP Stakes" industry, Neuberger does business under the trade name Dyal Capital Partners.

19. NB Alternative Advisers LLC is an SEC registered investment advisor that is affiliated with NB/Dyal Capital. Unlike Dyal Capital Partners, NBAA is a distinct legal entity from Neuberger Berman Group LLC.

**A. The Non-Disclosure Agreement Negotiations**

20. In 2018, NBAA and Golub began discussing a possible GP Stakes investment in Golub. At the time, Golub had hired an investment bank, J.P. Morgan, and outside counsel, Kirkland & Ellis LLP, to explore the possibility of accepting a GP stakes investment.

21. Golub knew that any potential outside minority investor would conduct significant due diligence before agreeing to invest. Because Golub was inviting potential outside minority investors to look behind Golub's curtain for the first time, necessarily exposing Golub's highly sensitive commercial and competitive information, Golub devoted extensive efforts to preparing and negotiating NDAs with potential minority investors. Golub even sought the opportunity to perform due diligence on potential investors' internal information barriers before it would sign an NDA to ensure that personnel involved in competing business would not have access to their information.

22. Negotiations addressing the NDAs took place *before* Golub disclosed any confidential information (including even Golub's flipbook). Golub spent more time negotiating the NDA governing the use of information shared during due diligence than it did negotiating the agreements setting forth the terms of the equity stake itself. Golub insisted that no personnel involved in the credit business of these potential investors be permitted to access any of Golub's information.

**B. The Non-Disclosure Agreement With NBAA**

23. Golub's rigorous approach to NDAs was fully reflected in the NDA it executed with NBAA on May 1, 2018. The NDA provides strict and comprehensive protections for the benefit of Golub and its affiliates and repeatedly makes clear that Golub can "terminate any discussions" or "cease the provision of the Information" at any time and for any reason without recourse. NDA §§ 2(f)-(g), 5(b).

24. The NDA states that "[NBAA] has requested and/or will receive information regarding [Golub] and its principals for the purposes of evaluating a possible investment, directly or indirectly, by [NBAA] in the business operated by [Golub] (the 'Transaction')." NDA, at 1 (Recital). NBAA agreed that it would "keep all Information strictly confidential" and that it would "use the information solely in connection with its evaluation, negotiation and implementation of a Transaction." *Id.* § 2(a). NBAA was also tasked with the affirmative obligation to "take all measures … to protect the secrecy of, and to avoid disclosure or use of, the Information in order to prevent it from falling into the public domain or the possession of persons other than [NBAA's] Representatives authorized by this Agreement to have the Information." *Id.* § 2(a). The Information is defined broadly to include everything provided by Golub to NBAA as well as "all notes, models, analyses, studies, interpretations, memoranda and other documents, material or reports (in any form or medium) prepared by [NBAA] that contain, reflect or are based upon, in whole or part, the information." *Id.* § 1.

25. The NDA provides that the confidential information that Golub disclosed under the NDA could ***only*** be accessed by NBAA—not any of NBAA's affiliate companies. *Id.* § 2(b). In fact, the NDA specifically provides that, if NBAA "has an Affiliate[2] or department or business line that invests in, or provides services to, alternative asset fund sponsors," then

> neither [NBAA] nor its Representatives shall provide any Information to such Affiliate, department, division or alternative asset fund sponsor, (x) such Affiliate, department or division shall not use the Information for any purpose, (y) such activities are, and shall be, conducted with informational barriers in place to protect the confidentiality of the Information in compliance with Agreement and applicable securities laws and (z) those individuals that serve as a director, officer or employee of both [NBAA] and such Affiliate of [NBAA], department, division or alternative asset fund sponsor shall not (1) provide any information to any director, officer,

[2] "Affiliate" is defined in part to mean "as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person…." NDA § 1.

> employee or other representative of such other Affiliate of [NBAA], department or business line and (2) such individual shall not direct or encourage such Affiliates of [NBAA], department, division or alternative asset fund sponsor to act or refrain from acting (i) based on the Information, (ii) in a manner that would be prohibited by [NBAA] or (iii) in a manner that could reasonably be expected to interfere with the existing relationships between [Golub] and the [current and prospective entities in which, or to which, Golub has invested or provided financing].

*Id.* § 2(b)(w).

26. Under the NDA, "at any time and for any reason," Golub may request the return and destruction of all information that Golub provided to NBAA pursuant to the NDA. *Id.* § 2(f). Upon Golub's notice to NBAA that it seeks such return and destruction, NBAA must "promptly (and in any event within ten (10) business days) (i) redeliver (or, at [NBAA's] election, confirm in writing to [Golub] the destruction of)" all information provided by Golub to NBAA and "destroy all extracts, reproductions, memoranda, notes and other materials prepared by [NBAA], its Affiliates or Representatives based on any Information." NDA § 2(f). While the NDA permits NBAA to retain copies of the Information "as required for legal, compliance or regulatory purposes," it further provides "that such retained Information shall not be accessed, recovered or used for any other purpose" and that "the obligations of confidentiality and non-use set forth herein shall continue to apply to such retained information following the termination of this Agreement for so long as such Information is retained." *Id.*

27. In recognition of the particular importance of protecting Golub's trade secrets that were disclosed throughout this process, the NDA provides that, to the extent that "Federal or state law pertaining to trade secrets or proprietary information" provide "greater protections of any Information than the protections set forth in this Agreement, such greater protections shall apply to such Information." NDA § 4. The NDA thus incorporated all protections for trade secrets

provided under any applicable body of law, including those under New York law and the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. ("DTSA").

28. In addition, the NDA expressly provides that NBAA's contractual obligations with respect to Golub's trade secrets survive the expiration of the other provisions of the NDA: "[W]ith respect to Information that constitutes a trade secret, [NBAA's] confidentiality and non-use obligations pursuant to this Agreement shall survive so long as the information that constitutes a trade secret remains protected as a trade secret under applicable law." NDA §§ 2(a), 18.

29. The NDA was executed and signed by Jamie Lurie under the title "Authorized Signatory." The entity for which Ms. Lurie signed was "NB Alternatives Advisers LLC,"[3] but NBAA purported to execute the agreement "on behalf of Dyal Capital Partners." Dyal Capital Partners is not a distinct business entity with its own legal personality; it is merely an internal business division of Neuberger. Further, the ultimate investment in Golub by affiliates of NBAA was made by entities that did not even exist when NBAA executed the NDA, and these entities are owned in part by investors who are not otherwise affiliated with NBAA and who were not part of Golub's due diligence of NBAA. The existence or identity of these entities was therefore not disclosed to Golub when entering the NDA. The NDA also forbids NBAA from assigning the NDA "or any part thereof without the prior written consent" of Golub, and any unauthorized assignment is "null and void." NDA § 16.

30. Golub insisted on the NDA's restrictions to ensure that ***only*** NBAA would use this information and that NBAA would ***only*** use it in connection with its evaluation of a potential investment in Golub. To underscore the importance of this information, the NDA contains

[3] The NDA states that "this Agreement constitutes the legal, valid, binding and enforceable obligation of Recipient." NDA § 7. "Recipient" is defined as "the undersigned." NDA, at 1 (Recital). NBAA, as signatory, is "the undersigned." *Id.* at 10.

restrictive covenants prohibiting NBAA from soliciting Golub employees, and provides that Golub can

> seek specific performance of the terms of this Agreement (without any requirement to post a bond or other security, which is hereby expressly waived by Recipient), including an injunction or injunctions to prevent actual or threatened breaches of the provisions of this Agreement without proof of actual damages and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction … and Recipient will not in any manner oppose the granting of such relief.

NDA § 4. If NBAA is determined to have breached the NDA, NBAA must reimburse Golub "for its reasonable out-of-pocket costs and expenses (including reasonable out-of-pocket legal fees and expenses) incurred in connection with such litigation, including appeals therefrom and proceedings related thereto." *Id.*

### C. Golub Discloses Substantial Confidential Information And Trade Secrets To NBAA

31. Shortly after the execution of the NDA, Golub opened a data room and NBAA commenced due diligence for the potential GP Stakes investment. NBAA then began to submit its due diligence requests to Golub's designated representative. Due diligence was conducted on behalf of NBAA both by employees of the Dyal Capital Partners division, and by Neuberger employees outside of that division. During due diligence, Golub provided extensive confidential and trade secret information to NBAA for its evaluation of the potential GP Stakes investment.

32. For example, in this process, Golub shared several presentations detailing its proprietary lending strategies, each of which constitute trade secrets. These presentations describe Golub's know-how in the marketplace, and these presentations are carefully guarded and only used for internal purposes.

33. Golub shared its own internal analyses of its past business performance and potential business opportunities, all of which constitute trade secrets. This information holds

immense value for Golub and informs all of its top-level strategic initiatives. Specifically, and among other things, Golub shared its Historical Origination and Deal Fees Analysis, Middle Loan Origination Activity and Opportunities by Sponsor, and List of Watchlist Account Names.

34. Golub shared information related to its internal operational management, including its management company financial projections, as well as highly secret internal valuations and risk analyses that inform its internal organization and its strategic initiatives. Such documents are trade secrets. For example, among other things, Golub shared its Allocation of Investment Opportunities; Valuation Disagreements; Operational Risk Committee Charter and Meeting Minutes; and its Process for Handling Closing, Settlement, Tracking, and Accounting For Investments.

35. Golub disclosed its proprietary fundraising information, including detailed information on its sources of capital, fundraising strategy, and marketing strategies. These documents and presentations are a key component of operating a direct-lending business and constitute protected trade secrets. For instance, among other things, Golub shared its revenue figures by Client Entity Type, Business Development Quarterly Reports, Fundraising History, Equity Commitments, Summary of Non-CLO Debt and Organizational Charts, Debt Capital Raising History, and its suite of marketing materials and campaigns.

36. Golub disclosed detailed information about the software and technologies that it uses to support its direct-lending operations, and Golub's overall technology strategies. This information is essential to Golub's provision of direct-lending services and is protected as a trade secret. Among other things, Golub disclosed a list of all software used by the Golub Management Entities; its approach to systems management; its Information Technology 2018 Goals; a list of its

technology expenditures; and a technology-vulnerability assessment, including past and present cybersecurity threats.

37. Golub provided extensive, confidential information related to the investment products that it offers. Golub also disclosed volumes of documents related to its corporate governance, capital structure, legal and regulatory information, financial and accounting information, and tax information. Many of these documents are private analyses that Golub uses for business strategy, and thus are protected as trade secrets.

38. Golub provided detailed information about its employees, including highly sensitive information about the productivity and compensation for individual loan originators.

39. Golub heavily protects the above-described information. Only authorized personnel within Golub are permitted to access these documents, and these documents are only disclosed when there are comprehensive confidentiality agreements in place—such as the NDA. The core competitive value of this information is derived from the fact that it remains a secret in the direct-lending industry. If this information were improperly disclosed to competitors, Golub would suffer a large, unquantifiable injury. Since the inception of its business, Golub has spent tens of millions of dollars cultivating the know-how and operational strategies laid out in these documents. All of the above information, documents, and presentations constitute protected trade secrets.

### D. The Investment Agreement And Ongoing Use Of Golub's Highly Confidential Information

40. Ultimately, after the due diligence process, the parties decided to move forward with the GP Stakes investment. On August 3, 2018, the Dyal Funds (each an Affiliate of NBAA under the NDA) executed an Equity Subscription and Investment Agreement with GCDM Holdings, LP, GCDM Holdings GP, LLC, GIM Holdings, LP, GIM Holdings GP, Ltd., GGP

Holdings, LP, and GGP Holdings GP, LLC (each an Affiliate of Golub under the NDA) (the "Investment Agreement").[4]

41. Under the Investment Agreement, the Dyal Funds were granted their own limited rights to information from the Golub entities that executed the Investment Agreement. Specifically, Investment Agreement Section 2.6 provides that the Dyal Funds have certain rights to meet with Golub senior management on a quarterly basis and receive audited and unaudited financial reports, management reports, compensation information, budgets, and distribution records, among other documents, on a quarterly and annual basis.

42. However, the information provided under the protection of the NDA includes significantly larger amount of material than the Dyal Funds were permitted to receive under the Investment Agreement, and the information provided under the protection of the NDA generally encompassed more sensitive documents than the information furnished under the Investment Agreement. On information and belief, NBAA and NB/Dyal Capital continued to utilize and rely upon the information provided under the NDA for ongoing analysis, monitoring, and reporting on its investment in Golub. To the extent the information was utilized for this purpose, it is likely to be present in multiple forms and in a myriad of locations across the NB/Dyal Capital business, without adequate tracking or efforts to safeguard the information. NB/Dyal Capital may have exploited or misused this access to information in the past in other ways; for example, NB/Dyal

---

[4] Since February, Golub has engaged in litigation and arbitration concerning its rights under the Investment Agreement. Golub named NBAA and Neuberger as defendants in that litigation. NBAA and Neuberger responded by strenuously denying they were bound by the Investment Agreement. Importantly, neither are "NBAA on behalf of Dyal Capital Partners" nor Dyal Capital Partners (to the extent it exists) parties to the Investment Agreement. Accordingly, the Investment Agreement, including Section 9.6 thereof, has no impact on NBAA and NB/Dyal Capital's rights and obligations under the NDA.

Capital began pitching certain Golub investors (who were not widely known as investors in the industry) a very short time after receiving Golub's closely-guarded investor information.

**E. NBAA Intends To Disclose Golub's Confidential Information and Trade Secrets To Blue Owl**

43. NBAA knew that when it received Golub's trade secrets and confidential information under the protection of the NDA that it was required to maintain the secrecy of such information. Indeed, that was the sole purpose of the NDA, which was expressly made "for the specific benefit of [Golub] and each of its Affiliates." NBAA, as a highly sophisticated investor, should be well aware of its obligations under the NDA and trade secret law. Yet NBAA is now poised to transfer all of Golub's confidential information and trade secrets to one of Golub's fiercest competitors.

44. On December 23, 2020, about two-and-a-half years after the execution of the Investment Agreement, Neuberger announced its intent to spinoff the entire Dyal Capital Partners business division to merge it with Owl Rock Capital Partners ("Owl Rock"), a direct and substantial competitor of Golub.

45. Shortly thereafter, on December 28, 2020, Neuberger and Owl Rock released the business combination agreement governing the merger (the "BCA"). Under Section 2.1 of the Business Combination Agreement governing that transaction, NBAA's parent has contracted to transfer "all [Dyal] Assets," which are defined to include "all Intellectual Property Rights of [Neuberger] primarily or exclusively used or held for use by the [Dyal] Business." "Intellectual Property Rights," in turn, include "trade secrets and know-how, processes, procedures, confidential business information and other proprietary information and rights."

46. On information and belief, NBAA, who possesses the information and trade secrets Golub shared with NBAA prior to the Dyal Fund's investment, intends to transfer that information

to Blue Owl in the course of NB/Dyal Capital's consummation of the Business Combination Agreement, whether by virtue of the transfer of Dyal entities and infrastructure that have gained access to the Information, or through the commitment to sell Intellectual Property. By agreeing to transfer Golub's confidential information and trade secrets, NBAA has anticipatorily breached at least NDA Sections 1, 2(a), and 2(b).

47. Moreover, through the Blue Owl transaction, NBAA's parent company is being directly compensated for this breach of the NDA and misappropriation of trade secrets. NBAA has thus not only willfully volunteered Golub's confidential information in flagrant disregard of its plain obligations under the NDA, but NBAA also has maliciously disclosed (and will continue to disclose) such information in pursuit of profit while inflicting competitive harm against Golub.

**F. NBAA Has Repeatedly Refused To Comply With The NDA**

48. Since February, Golub and NB/Dyal Capital have been litigating and arbitrating certain disputes related to the Investment Agreement which Golub believed was breached when NB/Dyal Capital agreed to the Blue Owl transaction. In connection with that dispute, on February 25, 2021, Golub filed for a preliminary injunction in aid of arbitration in New York Supreme Court. As part of that action, Golub requested the New York Supreme Court to enjoin the Blue Owl transaction until the parties rights under the Investment Agreement could be fully litigated. On April 2, 2021, the New York Supreme Court denied Golub's preliminary injunction. Golub and the Dyal Funds continue to arbitrate this dispute.

49. On April 6, 2021, four days after its request for preliminary injunction was denied, Golub sent a letter to NBAA, requesting pursuant to NDA Section 2(f), among other things, the return and destruction of all information that Golub provided to NBAA and assurance that the Dyal Funds had been instructed to comply with the same obligations. Given the modesty of its request,

and the clear and unambiguous language of the NDA, Golub believed that NBAA would immediately comply with its request, as required by the contract.

50. After the contractually required ten business days elapsed, NBAA sent a letter in response on April 20, 2021. In its response, NBAA stated its intent to retain the information provided to NBAA under the NDA. It did note, correctly, that the NDA permits it to retain copies of Golub's information for regulatory and litigation purposes (in an appropriately cordoned location within its legal/compliance team), but it did not confirm that it would only be used for this purpose, or describe any efforts taken to identify and destroy other copies of the information. It ignored Golub's direct request that it recall such information from its Representatives, destroy all extracts, reproductions, memoranda, notes, and other materials prepared by any of NBAA, its Affiliates, or its Representatives, and certify that destruction in writing. NBAA also declined to confirm whether it had impermissibly shared the Information with the Dyal Funds, contrary to the express terms of the NDA.

51. In one final attempt to prevent this lawsuit and arrive at a sensible commercial resolution, representatives from Golub reached out to representatives of NBAA between April 28 and May 2, 2021 to discuss NBAA's compliance with the NDA. While Golub was hopeful that NBAA would comply with its straightforward request that any copies of materials received under the NDA—including original Golub materials and materials derived therefrom—to the extent they were retained for "regulatory" or "legal" purposes be cabined and retained at Neuberger, and not at Blue Owl. Instead, Neuberger refused to agree to this straightforward request, and on May 2, 2021, NBAA sent another letter to Golub simply reiterating its previous letters stating that it was "adher[ing] to the terms of the NDA" and that it would "retain copies of … Information as required for legal, compliance or regulatory purposes." However, NBAA gave no indication that it would

adhere to Golub's request that the documents not be transferred to its competitor, nor any explanation of how it could possibly comply with its contractual obligations under the NDA while undertaking that transfer.

52. In fact, NBAA did not explain how it could transfer the documents in compliance with the NDA, because it simply cannot. NBAA's self-serving and conclusory reassurances of compliance only confirm Golub's suspicions that NBAA has disregarded and has not seriously grappled with its obligations under the NDA. On information and belief, one of the primary reasons that NBAA has been reticent to comply with its contractual obligations to destroy the data is because Defendants have already improperly commingled a substantial portion of Golub's confidential information with its general business information, in breach of its obligations to "take all measures … to protect the secrecy" of Golub's Information and not use Golub's Information for purposes outside of evaluating its investment in Golub. Now, doubling down on that brazen disregard of its contractual obligations to safeguard Golub's information, NBAA is poised to transfer all of that Information to Blue Owl.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract (NDA)
### New York Law

53. Golub incorporates and realleges the foregoing paragraphs by reference as though fully set forth herein.

54. The NDA is a valid, binding, and enforceable agreement that was executed by Golub and NBAA. The NDA imposes information-restriction obligations on NBAA.

55. To the extent that Golub possessed any obligations under the NDA, Golub fully performed all such obligations.

56. As explained more fully in paragraphs 43 through 47, NBAA agreed to sell Golub's confidential information that was provided to NBAA under the protection of the NDA.

57. NBAA's agreement to sell is an anticipatory breach of NBAA's obligation under NDA Section 2(a) to "keep all Information strictly confidential" and "use the information solely in connection with its evaluation, negotiation and implementation of a Transaction."

58. NBAA's agreement to sell is an anticipatory breach of NBAA's obligation under NDA Section 1 to "take all measures … to protect the secrecy of, and to avoid disclosure or use of, the Information in order to prevent it from falling into the public domain or the possession of persons other than [NBAA's] Representatives authorized by this Agreement to have the Information."

59. NBAA's agreement to sell is an anticipatory breach of NBAA's obligation under NDA Section 2(b) whereby "if [NBAA] has an Affiliate or department or business line that invests in, or provides services to, alternative asset fund sponsors" then

> neither [NBAA] nor its Representatives shall provide any Information to such Affiliate, department, division or alternative asset fund sponsor, (x) such Affiliate, department or division shall not use the Information for any purpose, (y) such activities are, and shall be, conducted with informational barriers in place to protect the confidentiality of the Information in compliance with Agreement and applicable securities laws and (z) those individuals that serve as a director, officer or employee of both [NBAA] and such Affiliate of [NBAA], department, division or alternative asset fund sponsor shall not (1) provide any information to any director, officer, employee or other representative of such other Affiliate of [NBAA], department or business line and (2) such individual shall not direct or encourage such Affiliates of [NBAA], department, division or alternative asset fund sponsor to act or refrain from acting (i) based on the Information, (ii) in a manner that would be prohibited by [NBAA] or (iii) in a manner that could reasonably be expected to interfere with the existing relationships between [Golub] and the [current and prospective entities in which, or to which, Golub has invested or provided financing].

60. As a result of these breaches, Golub was damaged, in an amount to be proven at trial.

61. Plaintiff seeks and is entitled to specific performance of the NDA, for Defendant to redeliver or destroy all information provided by Golub to NBAA and destroy all extracts, reproductions, memoranda, notes and other materials prepared by NBAA, its Affiliates or Representatives based on any Information (as these terms are defined in the NDA). In the alternative, Golub seeks damages, in an amount to be proven at trial.

**COUNT II**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act of 2016, 18. U.S.C. § 1836 et seq.**

62. Golub incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

63. As described more fully in paragraphs 31 through 39, Golub possessed trade secret information relating to Golub's proprietary business practices. Such information derives its value from not being known or readily ascertainable by parties in the direct lending industry.

64. Golub has expended tens of millions of dollars since the inception of its business in the creation, development, and cultivation of these trade secrets, and it would be exceedingly difficult—if not impossible—for a competitor, or any other party, to create, develop, or cultivate the same information.

65. Golub took reasonable measures under the circumstances to maintain the secrecy of the trade secrets identified and described in paragraph 39, including without limitation by limiting access to this information only to authorized personnel, by securing its electronic materials using password-protected computer programs, and also by securing its physical office spaces.

66. NBAA received access to this information only after signing the NDA, executed solely for the benefit of Golub and its Affiliates in contemplation of a then-secret possible proposal

for a GP Stakes investment. The manner and context of the communication of this information further evince the protective measures utilized by Golub to protect this information.

67. Also by virtue of this NDA and the confidential, pre-investment relationship between Golub and NBAA, NBAA had a duty, and knew it had a duty, to maintain the secrecy of all information that it received pursuant to the NDA, and to use it exclusively for the purposes of evaluating an investment.

68. Despite its full awareness of its duty to maintain the secrecy of such information, NBAA threatens and has agreed to sell this information as part of the Blue Owl transaction, thereby willingly transferring Golub's highly confidential information and trade secrets to Golub's direct competitor for its own financial gain.

69. NBAA was aware of its duty at the time it agreed to make such disclosures.

70. Golub did not consent to such disclosures.

71. NBAA thus threatens to misappropriate Golub's trade secrets.

72. As a result of this misappropriation, Golub will be damaged, in an amount to be proven at trial.

73. Because such acts of disclosure were done with a conscious disregard of Golub's rights and a desire to profit from such disclosures while causing Golub competitive harm, the acts of disclosure were "willful and malicious," as set forth in 18 U.S.C. §§ 1836(b)(3)(C) and 1836(b)(3)(D).

74. Plaintiff seeks and is entitled to preliminary and permanent injunctive relief for the threatened misappropriation of its trade secrets. In the alternative, Golub seeks damages, in an amount to be proven at trial.

**COUNT III**
**Misappropriation of Trade Secrets**
**New York Law**

75. Golub incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

76. As described more fully in paragraphs 31 through 39, Golub possessed trade secret information relating to Golub's proprietary business practices. Such information derives its value from not being known or readily ascertainable by parties in the direct lending industry.

77. Golub has expended tens of millions of dollars since the inception of its business in the creation, development, and cultivation of these trade secrets, and it would be exceedingly difficult—if not impossible—for a competitor, or any other party, to create, develop, or cultivate the same information.

78. Golub took reasonable measures under the circumstances to maintain the secrecy of the trade secrets identified and described in paragraph 39, including without limitation by limiting access to this information only to authorized personnel, by securing its electronic materials using password-protected computer programs, and also by securing its physical office spaces.

79. NBAA received access to this information only after signing the NDA, executed solely for the benefit of Golub and its Affiliates in contemplation of a then-secret proposal for a GP Stakes investment. The manner and context of the communication of this information further evince the protective measures utilized by Golub to protect this information.

80. Also by virtue of this NDA and the confidential, pre-investment relationship between Golub and NBAA, NBAA had a duty, and knew it had a duty, to maintain the secrecy of all information that it received pursuant to the NDA, and to use it exclusively for the purposes of evaluating an investment.

81. Despite its full awareness of its duty to maintain the secrecy of such information, NBAA threatens and has agreed to sell this information as part of the Blue Owl transaction, thereby willingly transferring Golub's highly confidential information and trade secrets to Golub's direct competitor for its own financial gain.

82. NBAA was aware of its duty at the time it agreed to make such disclosures.

83. Golub did not consent to such disclosures.

84. NBAA thus threatens to misappropriate Golub's trade secrets.

85. As a result of this misappropriation, Golub will be damaged, in an amount to be proven at trial.

86. Plaintiff seeks and is entitled to preliminary and permanent injunctive relief for the threatened misappropriation of its trade secrets. In the alternative, Golub seeks damages, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff Golub Capital LLC demands judgment against Defendant NB Alternatives Advisers LLC and/or Neuberger Berman Group LLC d/b/a Dyal Capital Partners as to all Counts of the Complaint stated against it, for:

a) preliminary and permanent injunctive relief;

b) specific performance;

c) compensatory damages;

d) consequential damages;

e) exemplary/punitive damages, including those pursuant to applicable statutes;

f) statutory royalties;

g) reasonable attorneys' fees and costs, including those pursuant to applicable statutes and contractual agreement;

h) prejudgment interest;

i) any and all other relief the Court deems just and proper.

Dated: New York, New York
May 4, 2021

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By : */s/ Andrew J. Rossman*
Andrew J. Rossman
Corey Worcester
Maaren A. Shah
Ellison Ward Merkel
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
andrewrossman@quinnemanuel.com
coreyworcester@quinnemanuel.com
maarenshah@quinnemanuel.com
ellisonmerkel@quinnemanuel.com

R. Brian Timmons (*pro hac vice forthcoming*)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
briantimmons@quinnemanuel.com

*Attorneys for Plaintiff*