UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                            :

GOLUB CAPITAL LLC,                        :

                      Plaintiff,          :

                                                :             21-cv-3991 (LJL)

        -v-                          :

                                                :       OPINION AND ORDER

NB ALTERNATIVES ADVISERS LLC, NEUBERGER  :
BERMAN GROUP LLC d/b/a DYAL CAPITAL    :
PARTNERS,                                :

                      Defendants.     :

---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants NB Alternative Advisers LLC ("NB Advisers" or "NBAA") and Neuberger

Berman Group LLC ("NBG" and, collectively with NB Advisers, "Defendants") move to

dismiss the complaint (the "Complaint") of plaintiff Golub Capital LLC ("Golub" or "Plaintiff")

pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.

For the following reasons, the motion to dismiss is granted.

## BACKGROUND

For purposes of this motion, the Court accepts as true the well-pleaded allegations of the

Complaint, as supplemented by the documents incorporated by reference.

## I.    The Parties

Golub is an alternative asset manager which provides direct lending and debt-financing

services to middle-market companies.  Dkt. No. 9 ¶ 16.  It raises capital from its limited partners

and deploys that capital to provide direct lending and debt-financing services to a portfolio of

companies with the over $35 billion of capital it has under management.  *Id.* ¶¶ 16–17.  It also

operates a publicly traded business development company to provide direct lending and debt-

finding services.  *Id.* ¶ 17.  Golub is a Delaware limited-liability company with its principal place

of business in New York, *id.* ¶ 8, but it also has offices in Chicago, San Francisco, and London,

*id.* ¶ 16.

Defendant NBG is an asset-management firm with over $400 billion in assets under

management.  *Id.* ¶ 18.  One of NBG's internal divisions was called Dyal Capital Partners

("Dyal"), through which NGB engaged in an investment model referred to as the "GP Stakes"

business.[1]  *Id.*  In this work, Dyal raised capital from limited partner investors and used that

capital to acquire minority ownership stakes in other asset-management firms, including both

private-equity firms and private lenders, such as Golub.  *Id.*  Dyal was not a distinct legal

entity—all employees who worked in NBG's GP Stakes business were employed by NBG or its

related affiliates and were not employed by any entity that contains the name Dyal.  *Id.*; *see also*

*id.* ¶ 10.  Dyal's website displayed NGB's logo and described Dyal as "Part of Neuberger

Berman Group LLC."  *Id.* ¶ 10.  NBG is a Delaware limited-liability company with a principal

place of business in New York; Dyal and NBG had the same New York address.  *Id.*

NBAA is an SEC-registered investment advisor affiliated with NBG and, while Dyal was

a part of NBG, Dyal.  *Id.* ¶ 19.  It is a Delaware limited-liability company with a principal place

of business that is, upon information and belief, in Dallas, Texas.  *Id.* ¶ 9.

## II.    The Non-Disclosure Agreement and Defendants' Due Diligence Regarding an Investment in Golub

In 2018, NBAA and Golub began discussing the possibility of a minority "GP Stakes"

investment.  *Id.* ¶ 20.  Golub devoted extensive efforts to preparing and negotiating non-

---

[1] The Complaint was filed before the Blue Owl Transaction was consummated and ownership of
the Dyal division and entities were transferred.  While the Complaint pleads the status and work
of Dyal vis-à-vis NBG in the present tense, the Court uses the past tense to reflect the current
circumstances.

disclosure agreements before it disclosed any confidential information to potential outside minority investors so that they could conduct due diligence.  *Id.* ¶ 21.

On May 1, 2018, Golub and NBAA executed a non-disclosure agreement ("NDA" or the "Agreement") to allow information to be shared during due diligence.  *Id.* ¶¶ 21, 23.  The NDA is signed by Golub and by NBAA "on behalf of Dyal Capital Partners."  Dkt. No. 55-3 at 10.  It recites that it is being made by "the undersigned," defined as the "Recipient," "for the specific benefit" of Golub "and each of its Affiliates," defined collectively as the "Company Group."  *Id.* at 1.  It also recites that "Recipient has requested and/or will receive information regarding the Company Group and its principals for the purposes of evaluating a possible investment, directly or indirectly, by Recipient in the business operated by the Company Group," defined as a "Transaction."  *Id.*

Under the NDA, Recipient was bound to "keep all Information strictly confidential" and to "use the information solely in connection with its evaluation, negotiation and implementation of a Transaction."  *Id.* § 2(a).  The NDA specifically authorized Recipient to "disclose Information to its Representatives for the exclusive purpose of advising Recipient in connection with its evaluation, negotiation and implementation of a Transaction" but required Recipient to "take all measures . . . to protect the secrecy of, and to avoid disclosure or use of, the Information in order to prevent it from falling into the public domain or the possession of persons other than Recipient's Representative authorized by this Agreement to have the Information."  *Id.*

The "Information" protected by the NDA is defined broadly to mean, subject to certain exceptions:

> (x) all documents, materials, reports, data, analyses, models and other information, whether written or oral and in whatever form or medium, relating directly or indirectly to the Transaction or the Company Group, its personnel, officers, principals, owners and assets and its existing or potential businesses, services,

processes, business development and marketing practices, financial results, projects, budgets, methods, business models, plans, investment or trading strategies (including past performance of such strategies and any examples of such strategies), investment documents, risk management systems, institutional or organizational structures, financial records and performance, internal processes and procedures, operations, compliance, prime brokers or counterparties, projects, legal matters (including litigation, regulatory, industry self-regulatory or compliance matters) that may be subject to privilege, trade secrets and know-how, including the current and prospective limited partners and investors in the Company Group (collectively, the "Investors"), the current and prospective entities in which, or to which, the Company Group has invested or provided financing (the "Obligors") and the related performance of such Obligors, which is furnished or presented to Recipient or any Affiliate on Recipient's behalf (whether furnished prior to or subsequent to the date of this Agreement), directly or indirectly, by or on behalf of the Company Group or any of its Representatives, (y) all notes, models, analyses, studies, interpretations, memoranda and other documents, material or reports (in any form or medium) prepared by Recipient or any of its Representatives that contain, reflect or are based upon, in whole or part, the information furnished to or on behalf of Recipient as contemplated by clause (x), and (z) the fact that the Company is considering a Transaction, that fact that the parties have engaged, may engage or will engage in discussions or negotiations regarding the Transaction, the nature or status of those discussions, and the existence of this Agreement . . . .

*Id.* § 1.

Importantly, the NDA contemplated that the Information protected under it would not necessarily be coextensive with, but might be broader than, information that constituted trade secrets or that was commercially sensitive.  The NDA generally has a three-year term except for, most notably, "Information that constitutes a trade secret," *id.* § 2(a), as to which the obligation of confidentiality would continue as long as the information was entitled to trade secret protection under applicable law, *id.* §§ 2(a), 18. The NDA carves out a separate category of Information that Golub deemed, in its sole discretion "sensitive . . .  due to commercial, legal or other factors," and provided that Golub could decide to provide such Information on its premises only and to provide it to a limited number of persons.  *Id*. § 2(c).

The NDA permitted Golub to request the return and destruction of all information that Golub provided to the Recipient pursuant to the NDA "at any time and for any reason."  *Id.*

§ 2(f).  It also permitted the Recipient to retain copies of the Information "as required for legal, compliance or regulatory purposes; provided, that such retained Information shall not be accessed, recovered or used for any other purpose." *Id*.  The NDA provided that Golub could, in addition to pursuing other remedies, "seek specific performance of the terms of this Agreement . . . including an injunction or injunctions to prevent actual or threatened breaches of the provisions of this Agreement without proof of actual damages and to enforce specifically the terms and provisions here of in any court of competent jurisdiction in the United States." *Id*. § 4.

The NDA specifically contemplated that the Recipient may disclose Information to its Affiliates and Representatives, as defined therein.  It says:

> Recipient shall direct each of its Representatives and Affiliates to whom Information is disclosed to comply with this Agreement to the same extent as Recipient and shall be liable for the failure of any of Recipient's Representatives or any Affiliate who is presented with or receives Information on Recipient's behalf to so comply as if Recipient had taken such actions.

*Id*. § 2(a).

The NDA also recognizes and addresses the possibility that the Recipient might have an affiliate, department, or business line that provides services to alternative asset fund sponsors and makes provision for that eventuality.  The NDA does not prohibit the Recipient from having such a business but rather requires that information barriers be put in place.  In particular, a section entitled Information Sharing provides as follows:

> <u>Information Sharing</u>. To the extent (A) Affiliates of Recipient or departments or business lines within Recipient engage in, or advise on, transactions for their own account or the account of others in debt or equity securities of or loans (or any derivatives thereof) to sponsor-backed operating companies and/or (B) Recipient holds equity interests in, or provides services to, alternative asset fund sponsors or has an Affiliate or department or business line that invests in, or provides services to, alternative asset fund sponsors, then (w) neither Recipient nor its Representatives shall provide any Information to such Affiliate, department, division or alternative asset fund sponsor, (x) such Affiliate, department or division shall not use the Information for any purpose, (y) such activities are, and shall be, conducted with informational barriers in place to protect the confidentiality of the

Information in compliance with Agreement and applicable securities laws and (z) those individuals that serve as a director, officer or employee of both Recipient and such Affiliate of Recipient, department, division or alternative asset fund sponsor shall not (1) provide any Information to any director, officer, employee or other representative of such other Affiliate of Recipient, department or business line and (2) such individual shall not direct or encourage such Affiliates of Recipient, department, division or alternative asset fund sponsor to act or refrain from acting (i) based on the Information, (ii) in a manner that would be prohibited by the Recipient or (iii) in a manner that could reasonably be expected to interfere with the existing relationships between the Company Group and the Obligors.

*Id.* § 2(b).

By its terms, the NDA terminates on May 1, 2021, which was three years from its May 1, 2018, date.  *Id.* § 18.  However, it also states that "any provision hereof that survives the termination of this Agreement in accordance with its terms (including Section 2(a) with respect to trade secrets and Section 2(f) with respect to retained Information) shall expressly survive the termination of this Agreement for so long as set forth in such provision."  *Id.*  As noted, Section 2(a) provides that "with respect to Information that constitutes a trade secret, the Recipient's confidentiality and non-use obligations pursuant to this Agreement shall survive so long as the information that constitutes a trade secret remains protected as a trade secret under applicable law."  *Id.* § 2(a).  Section 2(f) similarly provides that "to the extent any Information is retained as permitted by and in accordance with this Section 2(f), the obligations of confidentiality and non-use set forth herein shall continue to apply to such retained Information following the termination of this Agreement for so long as such Information is retained."  *Id.* § 2(f).  The "Information Sharing" obligation of Section 2(b) does not survive the expiration of the Agreement and therefore expired on May 1, 2021.

Under the NDA, the Recipient represented that it was "acting solely on Recipient's own behalf and on behalf of its managed funds and limited partners (solely in their capacity as limited partners in such managed funds)."  *Id.* § 2(d).  The NDA also forbids the Recipient from

assigning the NDA "or any part thereof without the prior written consent" of Golub and deems any unauthorized assignment to be "null and void."  *Id.* § 16.

After the execution of the NDA, Golub opened a data room, and NBAA commenced due diligence for the potential investment.  Dkt. No. 9 ¶ 31.  Due diligence was conducted on behalf of NBAA by employees of Dyal and by NBG employees outside of the Dyal division.  *Id.* During the course of due diligence, Golub shared the following information, each of which it alleges constitutes trade secrets: presentations and details of its proprietary lending strategy, *id.* ¶ 32; internal analyses of its past business performance and potential business opportunities, *id.* ¶ 33; information related to its internal operational management, including financial projections, internal valuations, and risk analyses, *id.* ¶ 34; propriety fundraising information, *id.* ¶ 35; information about its technology strategies and the software and technologies it used to support its direct-lending operations, *id.* ¶ 36; and information about its investment products, corporate governance, capital structure, legal and regulatory information, and financial and accounting information, *id.* ¶ 37.  In addition, Golub provided detailed information about its employees, including about their productivity and compensation, which Golub describes as "highly sensitive."  *Id.* ¶ 38.

## III.   The Investment

After the due diligence process, the parties decided to move forward with an investment transaction.  *Id.* ¶ 40.  On August 3, 2018, certain Dyal managed funds—referred to in the Complaint as the "Dyal Funds" and doing business as limited partnerships, *id.* ¶ 1—executed an Equity Subscription and Investment Agreement with affiliates of Golub (the "Investment Agreement"), *id.* ¶ 40.  Those funds were Dyal Capital Partners Mirror Aggregator (A) LP, Dyal Capital Partners Mirror Aggregator (B-GIM) LP, and Dyal Capital Partners Mirror Aggregator (B-GGP) LP (collectively "Dyal IV" or the "Dyal Funds").  *Id.* ¶¶ 1, 40; Dkt. No. 55-4 at 6.  The

Investment Agreement was signed for each of the Dyal Funds by "NB Dyal GP Holdings LLC, its General Partner."  Dkt. No. 20-2 at 86.

Under the Investment Agreement, the Dyal Funds were entitled to certain information from the Golub-affiliated parties to that agreement, but the scope of such information was not as extensive as the scope of the information it received under the NDA.  Dkt. No. 9 ¶¶ 41–42.  Like the NDA, the Investment Agreement contemplated that Dyal might come under the influence or control of one of Golub's competitors and gave Golub remedies if it did so.  *See* Dkt. No. 20-2 § 6.3(a).  First, in the event a Golub competitor—defined to exclude, for the purposes of Section 6.3, NBG so long as it is not owned or controlled by a competitor—owns "indirectly and/or directly, 20% or more of the voting securities of, or economic interests in, the DCP Manager or DCP GP Entities,"[2] an "Information Containment Event" is triggered, requiring these Dyal entities to conduct its business "with informational barriers in place to protect the Confidentiality of the Confidential Information" and the Dyal Funds to establish internal "procedures and guidelines"  *Id.*  Second, in the event that one of Golub's competitors owns "directly 20% or more" or "indirectly 50% or more" of Dyal Capital Partners,[3] an "Information Reduction Event" is triggered, and the information the Dyal Funds are entitled to receive going forward is reduced.  *Id.* § 6.3(b).  Finally, in the event that Dyal Capital Partners comes under the control of one of

---

[2] In Section 6.3, the Investment Agreement refers to "DCP GP Entities," which it defines as "the general partner entities of the funds that comprise Dyal Capital Partners (or its successor general partner to Dyal Capital Partners)," and "DCP Manager," which is defined to mean "NB Dyal IV Advisors LLC (or its successor manager to Dyal Capital Partners)."  *Id.* at 72.

[3] "Dyal Capital Partners" is defined in the Investment Agreement to mean "Dyal Capital Partners IV (A) LP," and "Dyal Capital Partners IV (B) LP," both "Cayman Islands exempted limited partnership[s]," as well as "any entity formed by or on behalf of any of them and their respective successor vehicles of the Dyal Capital IV vintage."  *Id.* at 73.  For the purposes of Part III of this Opinion and Order, "Dyal Capital Partners" shall have the meaning as set forth in the Investment Agreement.

Golub's competitors—by the competitor owning, "directly and/or indirectly, 50% or more of the voting securities of or economic interests in, or Control of" Dyal Capital Partners—a "Repurchase Right Event" is triggered, and Golub has the right to repurchase each of the Dyal Funds' stakes in Golub at fair market value. *Id*. § 6.3(c).

Plaintiff alleges "[o]n information and belief" that "NBAA and NB/Dyal Capital continued to utilize and rely upon the information provided under the NDA for ongoing analysis, monitoring, and reporting on its investment in Golub," that such information "is likely to be present in multiple forms and in a myriad of locations across the NB/Dyal Capital business, without adequate tracking or efforts to safeguard the information," and that "NB/Dyal Capital may have exploited or misused this access to information in the past in other ways," including, perhaps, to pitch certain Golub investors. Dkt. No. 9 ¶ 42.

## IV.    The Blue Owl Transaction

On December 23, 2020, NBG announced its intention to spin off its Dyal Capital Partners division and to merge it with Owl Rock Capital Partners ("Owl Rock"), forming a new entity called Blue Owl (the "Blue Owl Transaction"). *Id.* ¶ 44. Owl Rock is a direct and substantial competitor of Golub. *Id.*

On December 28, 2020, NBG and Owl Rock publicly released the business combination agreement that governed the merger (the "BCA"). *Id*. ¶ 45. Under Section 2.1 of the BCA, NBAA's parent agreed to transfer "all [Dyal] Assets," including "all Intellectual Property Rights of [Neuberger Berman] primarily or exclusively used or held for use by the [Dyal] Business." *Id*.; *see also* Dkt. No. 55-1 at C-21, C-38. The parties agree that the Blue Owl Transaction would constitute Information Containment, Information Reduction, and Repurchase Right Events under the Investment Agreement. Dkt. No. 51 at 61:12–15

Golub believed that NB/Dyal Capital's agreement to the Blue Owl Transaction constituted a breach of the Investment Agreement. Dkt. No. ¶ 48.  On February 25, 2021, various Golub entities sued the Dyal Funds, NB Dyal IV Advisors LLC, NB Dyal GP Holdings LLC, NBG, and NBAA seeking a preliminary injunction in aid of arbitration in New York Supreme Court and requesting the Court to enjoin the Blue Owl Transaction until the rights of the parties under the Investment Agreement could be fully litigated.  *Id.*; *see also* Dkt. No. 55-7.  On April 2, 2021, the court denied Golub's request for an injunction, Dkt. No. 9 ¶ 48, finding that Golub had "not demonstrated . . . a likelihood that it [would] show that [NBG and NBAA] are bound by the Investment Agreement or can be sued thereunder," Dkt. No. 55-8 at 101:20–24, and that  it was "wildly implausible . . . that the Neuberger entities all the way up to the top agreed to bargain away their ability to enter into corporate-wide transaction just in light of a single investment made . . . in connection with a single fund," *id.* at 106:20–25.

On April 6, 2021, Golub sent a letter to NBAA demanding that it return or destroy, pursuant to Section 2(f) of the NDA, all information that Golub had provided to NBAA.  Dkt. No. 9 ¶ 49.[4]  Golub also requested assurance that the Dyal Funds had been instructed to comply with these obligations.  *Id.*  NBAA responded on April 20, 2021, stating its intention to retain the information provided to it, noting that the NDA allows it to retain copies of the information for regulatory and litigation purposes.  *Id.* ¶ 50.  NBAA did not, however, confirm that the information would be used only for that purpose; describe any efforts taken to identify and

---

[4] Plaintiff's Complaint contains a footnote alleging that "to the extent the Court were to find that the NDA was executed by Neuberger d/b/a/ Dyal Capital Partners, then allegations in this Complaint referencing NBAA would apply equally to Neuberger d/b/a Dyal Capital Partners . . . as the party who received and controlled the confidential information provided by Golub under the NDA."  Dkt. No. 9 at 1 n.1.  The Court does not read that footnote allegation to refer to the more specific allegations of the Complaint such as that Plaintiff sent a letter to NBAA.  The Court thus considers the allegations with respect to the communication with NBAA as pleaded.

destroy other copies of the information; respond to Golub's direct request that it recall such information from its "Representatives"; or destroy extracts, reproductions, memoranda, notes, and other materials prepared by NBAA and certify such destruction in writing.  *Id.*  NBAA also did not confirm whether it had shared the information made available to it through the NDA with the Dyal Funds.  *Id.*

Between April 28 and May 2, 2021, Plaintiff's representatives reached out to representatives of NBAA and requested that, to the extent materials produced under the NDA were retained for regulatory or legal purposes, those materials be cabined and retained at NBG, rather than transferred to Blue Owl.  *Id.* ¶ 51.  NBAA responded on May 2, 2021 that it was adhering to the terms of the NDA and would retain copies of the Information "as required for legal, compliance or regulatory purposes."  *Id.*  NBAA did not indicate whether it would transfer the Information to Blue Owl or how, if it did, that would be in compliance with its obligations under the NDA.  *Id.*  Golub alleges that NBAA cannot transfer the documents in compliance with the NDA.  *Id.* ¶ 52.

Plaintiff asserts three causes of action against Defendants.  First, it claims that NBAA breached the NDA by agreeing to sell Golub's confidential information as part of the Blue Owl Transaction.  *Id.* ¶¶ 53–61.  Second, it asserts that NBAA has violated the federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, by transferring, as part of the Blue Owl Transaction, highly confidential information of Golub that it had a duty to protect under the NDA.  Dkt. No. 9 ¶¶ 62–74.  Third, it alleges that NBAA committed the tort of trade secret misappropriation by transferring Golub's highly confidential information and trade secrets to Golub's direct competitor for its financial gain.  *Id.* ¶¶ 75–86.  As noted in footnote 3, *supra*, the Complaint contends that the allegations with respect to the actions that NBAA took constituting

breach or misappropriation "apply equally to Neuberger d/b/a Dyal Capital Partners." *Id.* at 1 n.1.

## PROCEDURAL HISTORY

Plaintiff initiated this action on May 4, 2021.  Dkt. No. 1.  At the same time it filed its complaint, Plaintiff sought a temporary restraining order restraining Defendants from transferring Plaintiff's Information in connection with the Blue Owl Transaction.  Dkt. No. 5.  The Court denied the request for a temporary restraining order in favor of the application being treated as one for a preliminary injunction and set a hearing date for May 14, 2021.  Dkt. No. 42 at 16.  On May 14, 2021, the Court heard oral argument on the motion for a preliminary injunction.  Dkt. No. 51.  On that same date, the Court denied the motion for a preliminary injunction.  *Id.*

Defendants filed this motion to dismiss on June 30, 2021.  Dkt. No. 54.  On July 30, 2021, Plaintiff filed a memorandum of law in opposition to the motion to dismiss the Complaint, Dkt. No. 58, and, on August 30, 2021, Defendants filed a reply memorandum of law in further support of the motion to dismiss, Dkt. No. 60.  The Court heard oral argument on the motion on February 15, 2022.

## DISCUSSION

Defendants contend that the Complaint fails to state a claim for relief.  Defendants argue: (1) the Complaint does not assert a claim against NBG; (2) the Complaint fails to state a breach-of-contract claim against NBAA (or Dyal) because under the plain terms of the NDA, Dyal was permitted to access and use Golub's information for "legal, compliance or regulatory purposes," and Plaintiff does not allege any use that goes beyond those permitted purposes; (3) Plaintiff's misappropriation claims are duplicative of its breach of contract claims; (4) Plaintiff fails to state a claim for trade-secret misappropriation under either federal or state law; and (5) Plaintiff's sole

12

claim for relief of an injunction is barred by the doctrine of laches and accordingly the Complaint should be dismissed.

 To survive a Rule 12(b)(6) motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint need not allege "detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

 "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[A]t the outset of a lawsuit," a plaintiff ordinarily must plead "what the plaintiff must prove in the trial at its end." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020)).

 "For purposes of a motion to dismiss," a complaint is deemed "to include any written instrument attached to it as an exhibit or any statements or documents incorporated by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). The Court may therefore consider the various agreements that are extensively cited by and incorporated by reference into

the Complaint.  *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382 (S.D.N.Y.

2020).  The Court also may consider "matters of which a court may take judicial notice,"

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), including public filings in

other lawsuits.  *See Rothman*, 220 F.3d at 92; Fed. R. Evid. 201(b).

The Court considers first Plaintiff's claim for breach of contract.  It then turns to the

misappropriation claims.

## I.      Plaintiff's Claim for Breach of Contract

Plaintiff brings a breach-of-contract claim under New York law, alleging that "NBAA's

agreement to sell is an anticipatory breach of NBAA's obligation under [various provisions of

the] NDA."  Dkt. No. 9.  Under New York law "there are four elements to a breach of contract

claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the

plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Mancuso v. L'Oreal USA,*

*Inc.*, 2021 WL 1240328, at *3 (S.D.N.Y. Apr. 2, 2021) (quoting *Ellington Credit Fund, Ltd. v.*

*Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)); *see also Harsco*

*Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  "An anticipatory breach of contract by a

promisor is a repudiation of a contractual duty before the time fixed in contract for performance

has arrived."  *Princes Point LLC v. Muss Dev. L.L.C.*, 87 N.E.3d 121, 133 (N.Y. 2017)

(alterations adopted) (quoting 10-54 Corbin on Contracts § 54.1).  An anticipatory breach can

take the form of "a voluntary affirmative act which renders the obligor unable or apparently

unable to perform without" "a breach that would of itself give the oblige a claim for damages for

total breach."  *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656,

463 (N.Y. 1998) (quoting Restatement (Second) of Contracts § 250).  For such a breach "to be

deemed to have occurred, the expression of intent not to perform by the repudiator must be

'positive and unequivocal.'" *Princes Point LLC*, 87 N.E.3d at 124 (quoting *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978)).

Plaintiff's theory of anticipatory breach is that NBAA's parent (or, potentially, NBG/Dyal's parent, *see* Dkt. No. 9 at 1 n.1) agreed to sell Dyal and its assets—including, as alleged, Golub's confidential information to whish Dyal had access—to an outside corporation. *Id.* ¶ 45.  The parties agree that the transaction has now closed.  Dkt. No. 56 at 2; Dkt. No. 58 at 24.  Plaintiff highlights that the assets sold as part of the Blue Owl Transaction include the intellectual property rights exclusively used or held for use by Dyal, and this, in turn, includes Golub's information.  Thus, on Plaintiff's theory, the impermissible transfer of Golub's information will allegedly occur either "by virtue of the transfer of Dyal entities and infrastructure that have gained access to the Information, or through commitment to sell [i]ntellectual [p]roperty." *Id.* ¶ 46.

Defendants argue that Plaintiff's claim for breach of contract rests on the faulty premises that NBAA and only NBAA—and not Dyal—is a Recipient under the NDA and that therefore only NBAA, not Dyal, was permitted as a Recipient to access or use information under it. Defendants contend that Dyal is the Recipient on whose behalf the NDA was signed and that, as such, it was entitled to receive and use Golub's confidential information for legal, compliance, or regulatory purposes.  They also argue that the NDA "expressly allows the Recipient to use the information not only for 'evaluation' of a potential investment, but also for 'negotiation and implementation' of the investment." Dkt. No. 26 at 13 (quoting Dkt. No. 55-3 § 2(a)). Defendants also contend that the Blue Owl Transaction did not result in a sale Golub's confidential information; rather, it sold Dyal, which had the right to use Golub's confidential

information.  Thus, according to Defendants, the Complaint does not allege that any party to the NDA breached obligations under that agreement.

Plaintiff disagrees.  It does not dispute that the Dyal entities would be permitted to retain Golub information if they were considered to be parties to the NDA.  But it argues that "Dyal Capital Partners" is not a legal entity and thus cannot be a contractual counterparty.  According to Plaintiff, Dyal Capital Partners—which is simply "a trade name used to refer to an internal business division of [NBG]," Dkt. No. 58 at 13—could not have legal obligations; the obligations would belong only to NBAA and therefore NBAA must be the one and only Recipient under the NDA.  In Plaintiff's view, while NBAA as the Recipient might have been permitted to share Golub's confidential information with certain Dyal legal entities at the time they were affiliated with NBAA (because the NDA permits such information to be shared with Affiliates), that circumstance changed when the Dyal entities were transferred to Blue Owl.  At that point, they ceased to be Affiliates and became "outside" parties, with which NBAA could not share information and who were not permitted to retain Golub's confidential information.  In short, the Dyal entities are entitled to retain Golub information for legal, regulatory and compliance purposes while they are affiliated with NBAA; the moment they cease to be affiliated, they no longer are entitled to retain such information even if it were needed for legal, compliance or regulatory purposes.  In addition, Plaintiff argues that, once Section 2(f) of the NDA is invoked, no "Affiliate" or "Representative" may retain Golub's information.  In its view, if the NDA was interpreted to permit Dyal to retain Golub's confidential information solely because the NDA was signed by NBAA on Dyal's behalf, absurd consequences would follow: Golub would have rights against Dyal Capital Partners but, because Dyal Capital Partners is not a legal entity, it would have no meaningful way to enforce those rights.  Dkt. No. 58 at 14.

The threshold question is therefore whether the parties understood Dyal, and not NBAA (or not just NBAA) to be the Recipient under the NDA.   If Dyal was the Recipient, then it is entitled to retain Information at least for legal, compliance, and regulatory purposes—regardless of who owns it—and there would be no breach of contract.   Assuming Dyal is the Recipient under the NDA, a secondary question is whether the agreement to sell Dyal to Owl Rock as part of the Blue Owl Transaction was an anticipatory breach of the NDA.

"A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).   And "[w]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *Willsey v. Gjuraj*, 885 N.Y.S.2d 528, 530 (2d Dep't 2009) (internal quotation marks and citation omitted); *see also Beach v. HSBC Bank USA, N.A.*, 2018 WL 3996931, at *6 (S.D.N.Y. Aug. 21, 2018) (same).   If a contract's plain language contradicts the allegations of a complaint, it is the clear language of the contract that prevails.  *See Karmilowicz v. Hartford Fin. Servs. Grp.*, 494 F. App'x 153, 156 (2d Cir. 2012) (summary order); *Sazerac Co., Inc. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) ("[I]f the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint.").

Moreover, "[i]t is well settled that a contract must be read as a whole to give effect and meaning to every term . . . .   Indeed, a contract should be interpreted in a way that reconciles all of its provisions, if possible." *N.Y. State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010) (internal quotation marks and citations omitted and

alterations adopted); *see also Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) ("[U]nder New York law . . . a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless."); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").  "In interpreting a contract, courts 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'"  *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018) (quoting *MBIA Ins. Corp. v. Patriarch Partners VII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012)), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order).

The plain language of the NDA reflects the parties' mutual understanding that the Recipient referred to "Dyal Capital Partners" as the limited partnerships who managed the various Dyal entities that were to make an investment in Plaintiff and who therefore would need the information to evaluate, negotiate, and implement an investment in Golub.  The signature page of the NDA reflects that NBAA is signing not on its own behalf as a principal but "*on behalf of Dyal Capital Partners*."  Dkt. No. 55-3 at 10 (emphasis added).   The "Recipient," is defined as "the undersigned" meaning NBAA "on behalf of" Dyal.   *Id.* at 1. The second sentence of the NDA reflects this intent; it states that "Recipient has requested and/or will receive information regarding the Company Group and its principals for the purposes of

evaluating a possible investment, directly or indirectly, *by* Recipient in the business operated by the Company Group." *Id.* (emphasis added).

The parties' shared understanding as to the identity of the Recipient is further reflected in the NDA clause defining who could receive information as the result of the Recipient's entering into the NDA.  The Agreement states that "each of the terms 'Recipient,' 'Affiliates' and 'Representatives' with respect to Recipient shall not, for the avoidance of doubt, be deemed to include partner managers that Recipient (or its funds) own a minority interest in . . . , investments or portfolio companies of funds of Recipient."  Dkt. No. 55-3 § 1.  This provision would be nonsensical if the Recipient was something other than an entity that held interests or investments in other companies and managed funds that held portfolio companies—the precise activities in which NBG and Dyal are alleged to have engaged.  *See* Dkt. No. 9 ¶ 18.  By contrast, NBAA is alleged to be an investment advisor, not a fund manager or investor in other companies.  *Id.* ¶ 19. That the Recipient is the fund manager, and not an investment advisor, is further supported by other of the NDA's provisions.  In the "No Collaboration" clause, Recipient warrants that it "is acting solely on Recipient's own behalf and on behalf of *its* managed funds and limited partners (solely in their capacity as limited partners in such managed funds)."  Dkt. No. 55-3 § 2(d) (emphasis added).  NBAA is an advisory arm, while it is the Dyal limited partnerships that have managed funds.  The provision titled "Use of Information and Confidentiality" states "the Recipient may disclose Information to its Representatives for the exclusive purpose of *advising* Recipient in connection with its evaluation, negotiation and implementation of a Transaction." *Id.* § 2(a) (emphasis added).  "Representatives" include those who have "a good faith need to know the Information in connection with advising Recipient in connection with its evaluation,

negotiation and implementation of a Transaction." *Id.* § 1.  The Recipient is the person who is to evaluate, negotiate, and implement the Transaction; the advisor is someone different.

Read as a whole, the NDA clearly reflects that the "Recipient" is Dyal Capital Partners, on whose behalf the NDA is signed and who engages in the sort of activities in which the Recipient would be expected to engage under the terms of the Agreement.  Dyal Capital Partners thus is a party to the NDA, and the NDA gives Dyal Capital Partners a right to possess and to use (within limits) Golub's confidential information.  Those rights include the right to "use the Information solely in connection with its evaluation, negotiation and implementation of a Transaction." *Id.* § 2(a).  It also includes the right, notwithstanding a request for return of information by Golub, to "retain copies of such Information as required for legal, compliance or regulatory purposes." *Id.* § 2(f).

Dyal correspondingly has certain obligations under the NDA.  During the term of the NDA, if it had an affiliate, department, or business line that "engage[d] in, or advise[d] on, transactions for their own account or the account of others in det or equity securities of or loans . . . to sponsor-backed operating companies," it was required to maintain information barriers. *Id.* § 2(b).  It has a continuing obligation with respect to trade secrets, to "take all measures, but no less protective measures than [it] undertakes with respect to its own most confidential information, to protect the secrecy of, and to avoid disclosure or use of, the Information in order to prevent it from falling into the public domain or the possession or persons other than Recipient's Representatives authorized by this Agreement to have the Information." *Id.* § 2(a).  "[U]pon the request of [Plaintiff] at any time and for any reason," Dyal is required to return the Information. *Id.* § 2(f).  However, the NDA does not give Golub a right to prevent Dyal Capital Partners from being sold.  In the event of such an event, it may require Dyal—as it always has

the right—to return information, subject to the limitations set forth in the NDA.  But it may not prevent the change of control or deprive Dyal of the information it needs for legal, compliance, or regulatory purposes.

Plaintiff's argument to the contrary relies upon the fact that Dyal Capital Partners is not itself a legal entity.  It constitutes a constellation of legal entities.  Golub alleges that Dyal Capital Partners is a division of NBG and a trade name through which NBG does business.  Dkt. No. 9 ¶¶ 10, 18.   Based on those allegations, Golub contends that: Dyal is incapable of contracting on its own behalf; that it is an undisclosed principal which makes NBAA, as agent, a party to the contract; and, correspondingly, that the references to Recipient must be read to refer to NBAA and not to any of the entities under the Dyal Capital Partners umbrella.

There are two flaws in Plaintiff's argument.  First, just because the NDA uses the name Dyal Capital Partners as shorthand to refer to the constellation of legal entities, each of whom was doing business as a Dyal limited partnership does not mean that those limited partnerships were not bound by the NDA.   Golub's argument relies on a series of cases that hold that when a party signs a contract either without disclosing it is an agent or without identifying the principal or on behalf of a principal without a legal identity, the agent is bound as a principal.  *See Courthouse Corp. Ctr. LLC v. Schulman*, 902 N.Y.S.2d 160, 162 (2d Dep't 2010) ("When an agent signs on behalf of a principal, but the identity or legal status of the principal is not disclosed, the agent may be held individually liable on the contract."); *New Eng. Mar. Contrs., Inc. v. Martin*, 549 N.Y.S.2d 535, 535 (3d Dep't 1989) (holding signatory personally liable as an agent for a partially disclosed principal where "[n]either the contract nor any of the other documents relied upon gives any indication that Martin Chevrolet was a corporation, as opposed to simply a trade name");  *UBS Sec., Inc. v. Tsoukanelis*, 852 F. Supp. 244, 247 (S.D.N.Y. 1994)

("[A]n agent who fails to disclose at the time the parties enter a contract that he is acting on behalf of a corporate principal becomes personally liable under the contract."); *cf.* Restatement (Third) of Agency § 6.04.  But those same cases also hold that the principal—whether disclosed or not—still remains liable to the third party.  *See* Restatement (Third) of Agency §§ 6.02, 6.03. To the extent that Dyal Capital Partners itself or the parties under its umbrella lacked legal identity, then NBAA might be liable *if* there was a breach of contract.[5]  But that principle would not relieve the Dyal Capital Partners entities of liability as the primary obligor to Golub.  *See* Restatement (Second) of Contracts § 12, cmt. e ("Where partnerships or unincorporated associations have no power to contract as such, contracts made in their names bind the members instead."); Restatement (Second) of Agency § 20, cmt. e ("[O]ne appointed by a member of a partnership who has been authorized to act for partnerships is the agent of all the partners."); *see also Besen v. Kelley*, 373 N.Y.S.2d 765, 767 (Sup. Ct. Westchester Cty. 1975) (finding signature as agent for partnership to be "the equivalent of each of the partnerships signing individually"). Nor would it justify rewriting the NDA to substitute as the Recipient NBAA for Dyal Capital Partners.

The principle makes good legal sense.  The object of contract law is to honor the parties' intentions as those intentions are reflected in the written agreement.  *See Greenfield*, 780 N.E.2d

---

[5] In addition, although ordinarily the extent of the agent's disclosure of the existence of a principal is measured as of the time of contracting, where the third party discovers the existence and identity of the principal while a continuing divisible contract is still executory, the agent generally is not liable if the third party continues to perform after learning the principal's identity.  *See* 12 Williston on Contracts § 35:35 (4th ed.).  That principle would appear to be applicable here.  Under the NDA, Plaintiff at any time could choose not to continue to provide confidential information pursuant to the NDA.  The contract was divisible in that sense—each delivery of confidential information constituted a separate divisible act.  Thus, to the extent that Plaintiff delivered information to Defendants after knowing the existence of the particular legal entities that comprised Dyal Capital Partners and who were receiving the information, it is those entities alone and not NBAA which would be liable for a breach by the entities.

at 170 ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."); *Long Island Med. & Gastroenterology Assocs., P.C. v. Mocha Realty Assocs., LLC*, 143 N.Y.S.3d 56, 61 (2d Dep't 2021) ("A court's fundamental objective in interpreting a contract is to determine the parties' intent from the language employed and to fulfill their reasonable expectations."). Where the parties use an abbreviation or shorthand, the answer is not to ignore the parties' intent. Where what has been written reflects a meeting of the minds the answer the cases give is that the Court should honor that meeting of the minds. For that very reason, where a contract is drafted to impose legal obligations on a division of a corporation, courts will not hold that the contract is lacking for a meeting of the minds. Even though one of the contracting parties to the agreement lacks capacity, courts will construe the agreement to refer to the person the parties plainly intended to be bound.[6] *Cf. Maranatha Assocs. Inc. v. Titan Grp. Inc.*, 609 N.Y.S.2d 368, 369 (3d Dep't 1994) ("The fundamental premise underlying . . . [the] motion to dismiss . . . is that . . . plaintiff, having no legal existence independent of [a corporation] cannot enter into contracts or bring legal action. We disagree. In a case where there is shown to be an appropriate delegation of authority, an unincorporated division of a corporation can sue on behalf of the jural entity of a corporation of which it is a part."); *Orange County Publications Div. of Ottaway Newspapers-Radio, Inc. v. White*, 284 N.Y.S.2d 293, 296 (Sup. Ct. Orange Cty. 1967) (explaining that outcome of proceeding brought by petitioner identified as a division of a domestic corporation

---

[6] Under New York law, the fact that a business division is unincorporated and does not have a legal entity separate and apart from the corporation to which it belongs does not preclude it from entering into contracts. *See Maranatha Assocs. Inc. v. Titan Grp. Inc.*, 609 N.Y.S.2d 368, 369 (3d Dep't 1994). In such a case, the corporation to which a division belongs may be held liable on the contract. Golub appears to recognize as much by suing NBG—the corporation of which Dyal Capital Partners is a division.

would be conclusive on domestic corporation); *Harrington v. Crater*, 2017 WL 4621618, at *4 (E.D.N.Y. 2017) ("[U]nder New York law, 'it is well settled that a trade name has no separate jural existence, and that it can neither sue nor be sued independently of its owner.'" (internal quotation marks omitted) (alteration adopted) (quoting *Leser v. Karenkooper.com*, 856 N.Y.S.2d 498 (N.Y. Cty. Sup. Ct. 2008))); *Provosty v. Lydia E. Hall Hosp.*, 457 N.Y.S.2d 106, 108 (2d Dep't 1982) (same).

That principle applies with full force here.  The NDA as drafted reflects the parties' intent that the limited partnerships within the Dyal Capital Partners constellation were the ones who would have both rights and obligations.  It also reflects the shared understanding that those limited partnerships were not organized and operated each as separate entities but were part of a group that were jointly run.  The NDA recognizes that the Recipient is acting "on behalf of its managed funds and limited partners."  Dkt. No. 55-3 § 2(d).  The parties presumably could have drafted the NDA to identify and refer to each of the legal entities within the Dyal Capital Partners constellation separately, but the fact that they did not do so does not mean that they lacked a meeting of the minds with respect to who the Recipient was under the Agreement or that the entities could receive the Information free from any obligations directly to Golub if they breached the terms of the NDA.

The Court's conclusion that Dyal was the "Recipient" under the NDA does not, therefore, result in the lack of remedy envisioned by Plaintiff.  Plaintiff can, and indeed has, sued the legal entity to which Dyal Capital Partners is alleged to be a part.  And if a Dyal entity uses Information beyond the limits permitted by the NDA, it can sue that Dyal entity in addition to NBG.

Moreover, even if the entities in the Dyal Capital Partners constellation could not be sued, it would not follow that NBAA is the "Recipient" or that the entity allowed to retain the Information was NBAA and not the Dyal entities.  Plaintiff appears to concede that while the Dyal Capital Partners entities were owned by NBG and affiliated with NBAA, those entities had a right to the Information as a Recipient and not solely as an Affiliate.  The NDA would make no sense if read otherwise.  Section 2(a) provides that the "Recipient . . . shall use the Information solely in connection with its evaluation, negotiation and implementation of a Transaction" and that "the Recipient may disclose Information to its Representatives for the exclusive purpose of advising Recipient in connection with its evaluation, negotiation, and implementation of a Transaction."  Dkt. No. 55-3 § 2(a).  The sole reference to Affiliate in those provisions is the requirement that "Recipient shall direct each of its Representatives and Affiliates to whom Information is disclosed to comply with this Agreement to the same extent as Recipient" and that Recipient will be liable for a breach of the Agreement by any Affiliate.  The person who is the Recipient is the one making the investment and the one with the right to the information from which Affiliate rights derive.  If, for example, it were NBAA and not the Dyal Capital Partners who were being transferred, and NBAA was thus no longer affiliated with Dyal, NBAA could not retain the Information and thereby strip the Dyal Capital Partners of their right to it.  It follows then necessarily that even after the Dyal Capital Partners are sold, they remain the Recipient under the NDA.  The parties could have written into the NDA a change-of-control provision; they did not.  What they cannot do is, as if by an act of legal legerdemain, transmogrify Dyal Capital Partners as Recipient into NBAA as Recipient.  Thus, if the Dyal Capital Partners entities violate their obligations under the NDA, NBAA (if an undisclosed principal) might be liable for that breach.  The NDA, however, would not be breached by Dyal

Capital Partners, doing, while owned by Blue Owl, exactly what it could do while owned by NBG.

That Dyal was the Recipient under the NDA is dispositive of the question whether an anticipatory breach was committed.  As the Recipient under the NDA, Dyal had the right to access and use the information shared with it pursuant to that Agreement.  Dyal's right to possess that information did not terminate at the time the investment in Golub was consummated.  *See* Dkt. No. 55-3 § 2(a) (allowing the Recipient to use the Information in connection with the implementation of a transaction).  If it did, the contractual language that imposed confidentiality and non-use obligations on trade secrets that outlasted the term of the Agreement and, indeed, for "so long as the Information that constitutes a trade secret remains protected as a trade secret under applicable law," *id.*, would be unnecessary.

Because Dyal, as the Recipient under the NDA, had an independent right to the information shared pursuant to that Agreement, Plaintiff's argument that NBAA breached the agreement by transferring confidential information to Dyal fails.  Contrary to Plaintiff's argument, Dyal's right to the information shared under the NDA is not a function of its status of an "Affiliate" of NBAA—it is entitled to the information because it was the Recipient under the Agreement.  Its right to the information therefore does not terminate if and when its affiliation with NBAA ceases, and any argument that Dyal becomes an "outside party" to NBAA after the Blue Owl Transaction is therefore irrelevant.  *Cf.* Dkt. No. 58 at 16.  That Dyal had a right to this information as a Recipient also defeats argument in its opposition to the motion to dismiss that the NDA was breached because "the NDA does not permit any Affiliate or Representative to retain Golub's information once Section 2(f) is invoked."  *Id.*[7]

---

[7] Plaintiff pleads a breach of contract based on the sale of Dyal and its assets in the Blue Owl

Nor does the sale of Dyal itself constitute a breach of the Agreement.  To be sure, Dyal is under an obligation to "keep all Information strictly confidential."  Dkt. No. 55-3 § 2(a).  But the Complaint does not allege that Dyal disclosed the Information by any means other than the sale of Dyal and its assets.  Plaintiff's theory rests on the assumption that Dyal will automatically breach the NDA by taking part in the Blue Owl Transaction because it—and its assets and information it possesses—will be a part of a different entity, and Golub's information will therefore no longer reside with Dyal as the Recipient and will necessarily be shared.  But the NDA expressly contemplates that the "Recipient" can be controlled by, or under common control with, another entity without affecting its status as a Recipient or its attendant rights and obligations under the NDA.  Indeed, the definition of Affiliate includes a company that "directly or indirectly, controls, or is controlled by, or is under common control with" another entity.  *Id.* § 1.  The NDA contemplates that a Recipient is distinct from its Affiliates, and it imposes obligations on the Recipient to limit information sharing with Affiliates in certain situations.  If the fact of a transfer of control of a Recipient meant that the new entity that controlled the Recipient had unfettered access to the information it possessed, the definition of Affiliate would be rendered meaningless and the limitation obligations would be surplusage.  Plaintiff's argument—if accepted—would rewrite the parties' agreement.  Under the NDA, Dyal was the Recipient and not an Affiliate or Representative of the Recipient.  It had the right to take on new ownership and to be transferred without forfeiting that status or returning the information to

---

Transaction and does not plead the retention of information as a basis for its breach-of-contract claim.  Dkt. No. 9 ¶¶ 57–59 (alleging that "NBAA's agreement to sell is an anticipatory breach of NBAA's obligation under [the] NDA").  Instead, it seeks the return or destruction of information as a specific-performance remedy for the breach.  *Id.* ¶ 61.

which the NDA gave it rights.  By arguing to the contrary, Plaintiff in effect seeks a change-in-control provision for which it did not bargain and which it did not obtain.

That Dyal was entitled to the confidential Information as a Recipient means that the Blue Owl Transaction does not, in itself, constitute a breach defeat Plaintiff's claim.  Outside of the very fact that Dyal was engaged in the Blue Owl Transaction and that Dyal and its assets may be under new control as a result of that transaction—facts that, if taken as true, do not constitute a breach—Plaintiff has not alleged facts that suggest Defendants have engaged in any activity that would breach the NDA.  Because Plaintiff has not alleged that Dyal did anything it was not allowed to do under the NDA, it has not alleged facts sufficient to "nudge [its] claim across the line from conceivable to plausible."  *Exceed Holdings LLC v. Chi.Bd. Options Exch. Inc.*, 2018 WL 4757961, at *5 (S.D.N.Y. Sept. 30, 2018) (quoting *Twombly*, 550 U.S. at 570); *see also Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*, 55 N.Y.S.3d 54, 54–55 (1st Dep't 2017) (dismissing claim for breach of confidentiality agreement where plaintiff made only vague and conclusory statements that agreement was breached).

## II.    Plaintiff's Claims for Misappropriation

Plaintiff also brings claims for misappropriation of trade secrets under the DTSA and New York law.  Defendants move to dismiss on the basis that they are duplicative of Plaintiff's breach-of-contract claim and because "Plaintiff has not alleged adequately that Defendants misappropriated any trade secret."  Dkt. No. 56 at 18.

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.

1999)).  "Similarly, under the federal Defend Trade Secrets Act, 'a party must show "an uncontested disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty."'" *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018) (quoting *In re Document Techs. Litig.*, 2017 WL 2895945, at *5 (S.D.N.Y. July 6, 2017)).

The Complaint does not allege that the Defendants misappropriated those secrets. Plaintiff concedes that its claim for federal and state misappropriation stems from its claim for breach of contract.  Dkt. No. 58 at 19 ("[S]haring trade secrets in violation of a non-disclosure agreement, like Defendants did here, violates the DTSA.").  That is, the "misappropriation" complained of is Dyal's "continued use of Golub's trade secrets" to which it had access under the NDA, *id.* at 19, 21, notwithstanding the Blue Owl Transaction, Dkt. No. 9 ¶¶ 68 (alleging that NBAA violated the DTSA by "agree[ing] to sell this information as part of the Blue Owl transaction").  Indeed, Golub alleges that the duty to maintain the secrecy of the information was "by virtue of [the] NDA and the confidential, pre-investment relationship."  *Id.* ¶¶ 67, 80.  The Court has concluded, however, that the Dyal entities were parties to the NDA and were entitled to the information thereunder, notwithstanding any change in ownership, and that the Complaint thus fails to state a claim that Defendants have breached the NDA.  It therefore follows that the misappropriation claims, which rest entirely upon the breach-of-contract claim, do not state a claim for relief and must be dismissed.

**CONCLUSION**

The motion to dismiss is GRANTED with prejudice.[8]

The Clerk of Court is respectfully directed to close Dkt. No. 54 and to close the case.


SO ORDERED.

Dated: February 22, 2022
       New York, New York          _____
                                           LEWIS J. LIMAN
                                       United States District Judge

---

[8] Plaintiff has sought leave to replead to add greater specificity to its trade secrets claim.  The lack of specificity is not the basis on which the trade secrets claim is dismissed, and Plaintiff has not identified any facts that would cure the defects in the Complaint.  Accordingly, there is no basis to permit Plaintiff an opportunity to replead here. *In re Am. Exp. Co. Shareholder Litig.*, 39 F.3d 395, 402 (2d Cir. 1994) (affirming dismissal without leave to replead where appellants did not indicate how they could satisfy proximate cause requirement, and it was not obvious that the facts could plead a sufficient allegation of proximate cause).